W.C. Melcher of Melcher, Melcher, and Melcher. We are privileged to represent Mr. Peter Kim on his appeal by appointment of this Honorable Court. We have the order, the latest order from the court asking us to direct our attention primarily, we didn't say entirely, but primarily to Mr. Kim's case. Yes, Your Honor. Your Honor, the court have... Are you going to be dividing time? How do you want to work this out? Are you going to argue for both? No, Your Honor. I spoke with counsel and co-counsel, Mr. Greenberg, and I believe that our opening, each of our opening comments would be approximately three to five minutes or more. I'm not interested in the breakdown. I just want to know, are you allocating time? Are you taking 15 of the 20? No, Your Honor, we haven't discussed that. We would... Don't discuss it. Just tell me what you, between you think you're going to need of the 20 minutes. How much are you going to need for Mr. Kim or planning to use for Mr. Kim? Well, I would hope to use 10 minutes for Mr. Kim. Okay. Thank you. The court has obviously spent considerable time on giving considerable thought to this case, and we're most appreciative of that. And keeping that in mind, I don't think it's necessary to burden the court with another recitation of the facts today. The briefings pretty well went through the facts, and the facts really, I don't think, are really all that much in dispute, nor is the law. It's just the application of the law to the facts. Now, recognizing the difficulty that anyone has in proceeding with a case of this type, and I mean an appeal-based... Just because we allocated time doesn't mean you have to... If you're happy with your briefs, that's fine with us. But my question is, in this case, Mr. Kim received, I think the evidence shows, somewhere around $30,000 to $31,000 in compensation. Is that correct? Well, there's... I didn't say for what. I just said there's... All right. He received it in compensation. I understand, maybe I misunderstand it, that Mr. Kim's argument, that was simply for acting as the driver. Is that correct? As the driver and also as an interpreter, not as a recruiter. Well, I'm not... I just said compensation. I didn't say as for what. Yes. Okay. So he got $31,000, and is it also correct that he got $20 per person for the driving, or was that included within the $31,000? No, Your Honor. I think the $30,800 to $31,000 minus the $13,000, which was the loan for the van that he bought, which he paid back. But the $20 for each person driven was in addition to that. That was paid by the prospective beneficiaries. All right. What was the time period for which that payment was made? I believe it was approximately five months, Your Honor, over a period of five months. Now, does the record indicate he apparently worked for this company, the United Medical Supply, that was owned by Mr. Luan, I think, and perhaps others. Was he a full-time employee of that company? I don't think he was really an employee in the legal sense. I think he was more of an independent contractor. He would drive on occasions, certainly not a 1099 or a W-2 kind of an employee. Does the record indicate whether other people were likewise employed as drivers on a similar basis? Yes, Your Honor. There were, I believe as is relevant here, there were a total of, if I understand it, that were relevant here were three different drivers. And does the record indicate whether they also were charged with this type of fraud? I do believe they were. I think there was a total of 13 defendants here, and I didn't focus in on those other people. And does the record indicate whether any of these other people were convicted, the other drivers I'm talking about? I honestly don't know. Okay. You don't know whether the record tells that? I don't honestly know. We found it a little difficult, of course, to get all the facts before the court. We gleaned through the transcripts, got out what was there. We went through the government's response in opposition to the Rule 29 motion. That was helpful. And we also double-checked to make sure we had everything when we referred to the district court's extreme discomfort or concerns with regard to the Rule 29 motion, where the court interrupted the Rule 29 motion and actually said, look, please, if you would kindly, mainly, I think, to the government, if you could kindly get us a listing of everything you're charging Kim did. So I think we've got everything he did, innocuous or not. And the district court, of course, said that it was struggling with the facts. And this is the Rule 29 motion. Counsel, we're familiar with all of that. If you have something you want to focus us on, that would be helpful. Otherwise, you don't need to explain how you got there. We understand the case. Yes. Again, we're talking about a knowing and willful violation or participation. And after the Rule 29 motion, I think I'd like to stress this, that the court had said that the court had said in the Rule 29 motion, following the Rule 29 motion, that a reasonable jury could have found that he had to have known, that he had to have known. And I think this was the government's position all along, that there was an inference that he had to have known, that he should have known. And I don't think should have known or had to have known is good enough. Mr. Melcher, maybe the question, and you can tell me. Does the amount of money he received, when compared with the amount of money that one would customarily receive for doing the services that he admits he performed, trigger some question as to the source of the funds? Or the illegality of the payment? Or the illegality of the payment. Well, I think if we take, let's say, $30,000 minus $13,000 for the loan for the van, we've got $17,000, $18,000. Plus $20 per head. Plus $20 a head. But, again, just the amount he received from this organization, if we double that, if we say he got that in six months, we double that, we've got $34,000. I don't know how many people he drove. There were allegations in this case that were brought before the court, obviously, with 80,000 prescriptions for insure that were written. They didn't bring all 80,000 in. I think as far as Mr. Kim was concerned, he brought in four people. Honestly, I don't know how much time he spent on the case. And even if I did, I couldn't say because it wasn't part of the record. In other words, your answer is no. No. I don't see that. In your view, there was nothing disproportionate about a driver receiving the amount of money he received. Well, especially since there's been no evidence to show, you know, what a person would ordinarily receive for driving and interpreting. I think interpreting is a very important thing we have to consider here. Interpreters in certain languages perhaps are more compensable than others. We've got some, you know, Korean, we've got Vietnamese languages here that are a little bit more esoteric, and they're a little bit more difficult to translate. Who is this interpreting benefiting? I'm terribly sorry? Who is benefiting from his interpreting? The prospective Medicare beneficiary certainly was, and so was the organization that was requesting the forms to be filled out. Apparently the forms were in English. I don't know whether or not Medicare has Vietnamese forms or Korean forms, but there's been this charge that, well, these forms were in English and nobody could understand them. I don't know that there's Korean forms. But certainly the organization, everyone benefited from the interpretation. And, again, I don't think there's such a thing as free milk. This isn't a place where something was given free. The people were taken down to the doctor's offices as potential Medicare beneficiaries, and that would be an entitlement, of course, if they were entitled to this so-called free milk. It wasn't free. A determinate nation had to be made by a medical, it turns out. Is there anything peculiar in this record in your view as to how the milk was distributed? We know it wasn't milk, but let's call it milk because that's how it's referred to. As far as Mr. Kim is concerned? Yes, as far as Mr. Kim is concerned. No, I really don't see it. He took the prospective Medicare beneficiaries down to these doctors and was then, he gave the so-called free milk to them. Sure, threw it at one, kind of threw it at somebody. Well, I guess there was a little frustration. But I think if we look at the record there. That's why I'm asking you, is there anything about the way the milk was distributed that should raise some questions in your view? A question as to legality? No, Your Honor. I don't see that. Even this so-called meeting in this clandestine parking lot. I don't know. Maybe it was raining. But they say that he met someone in an underground parking lot. Transferred the milk. Yes. I mean, there was no furtive conduct. Maybe that's just where they decided to meet. They had to meet somewhere. They met in a parking lot. But the thing, don't you have a little problem? We are not the fact finders. Yes. This isn't being tried to us. That's correct. We're reviewing the record of the trial. That's correct. And I'm asking you whether there were certain peculiarities that somebody would have been concerned about in a legal transaction. Again. And I guess your answer is no. It's no. Under these circumstances, we've got a man in his low 80s, early 80s. 81, I think he said he was. He's 81 years old. There's no showing that he understood that there was any enteral feeding required. Maybe the enteral feeding was given. We don't know. He didn't know, certainly. Everything he gave, all of these boxes of insurance he gave out were receipted. They were receipted as received. Yes, he got frustrated one time, I think, with that one patient. And he threw it on the ground. Here it is. But, again, the box of insurance was receipted and the receipts were taken back. Mr. Melcher, I think the record shows he was 84, but whatever. Does the record indicate what he did before he was involved in this enterprise? No, Your Honor. I don't believe it does. I think the only reference was he came to America in 1976. 74, but in any event, it's a long time ago. I'm just interested because, as Judge Ferris indicated, as you know, the presumption, once the jury has decided, we have to construe these things in the way that is most beneficial to the government, sustaining the verdict. We have to find that there is just no way that a reasonable juror could have reached this conclusion. And I'm having difficulty, you're not helping me anyway, find why this evidence should not be found substantial. I mean, an 84-year-old man doing this in the first place is a little strange. Would you not agree? Well, again, considering the community, it's a minority or whatever you want to call it, a community, a community where people didn't speak English. But he's an 84-year-old man. Oh, the fact that he was 84? Let's not get into age discrimination. No, no, I'm just trying to understand. This involves apparently some lifting of some boxes and that sort of thing. I'm trying to understand what would – is there anything in the record that would indicate why he went into this if it were not because it was highly lucrative, because it was a criminal enterprise? Well, I don't think there's anything to show that he knew it was a criminal enterprise. There must be a specific intent. It must be willful. It must be knowing. And as Judge Carney pointed out in the rule, I can give you the citation. I'm sure the court's read it. He pointed out, he said before, told the government, he said, before this case I didn't know that in order to get paid for insure, the medical provider needed to have a certificate of medical necessity that it had to be enterally fed. I didn't know that. He said, so you've got a real uphill challenge. And the comment was by the prosecutor, well, he should have known. Okay. I think why don't you – we'll give you a minute on rebuttal. But I think your co-counsel is entitled to some time. Thank you. Good morning, Your Honor. Stanley Greenberg on behalf of Mr. DeWong. May it please the Court. I raised three issues on behalf of Mr. DeWong. I do believe, as I read over the file, they're pretty well briefed. What I would like to do on both sides, but what I would like to do, unless the Court has some questions, is just emphasize or underscore three points that I think deserve and invite scrutiny from the Court. First is on the Franks v. Delaware issue. What about if you take out her misstatement about case v. unit and look at the rest of that extensive affidavit, what's missing? Why isn't there still sufficient? What's missing is there's nothing that points to probable cause to search United Medical Supply. And the Court said in a conclusion in its order that the Magistrate would have signed it anyhow, but Judge Cornyn did not cite to any evidence. I invite scrutiny of that affidavit because there's plenty of probable cause as to these doctors and other people. But the only thing that gives probable cause to search UMS, United Medical Supply, are these repetitive false statements that Mr. DeWong's company was billing hundreds of cans versus nutritional units. And under Ninth Circuit law, the Cheshire and Kiowa cases, once you show a false statement and that the true facts were known or readily knowable, that first prong is met. And the units in a can. I knew it at one point. I think it's about. Do we know it from reading this record? It's in the briefs, Your Honor, yes. I think it's about a hundred. Well, as I read the brief, there was great emphasis on the fact that a person said cans when she should have said units. But that's the difference. That's the... We briefed that through. It's a huge difference because Medicare does not bill in cans. It bills in nutritional units. And the affiant said, I got this from reviewing Medicare records, which cannot be true because they don't bill in cans. Until I saw what you said, I just assumed a unit and a can were interchangeable terms. No, there's something like a hundred. I know it's not so now because you pointed it out and indicated that somebody who would say the difference, would use one word instead of the other, has to be lying and everybody has to know they're lying. And all I'm telling you is that when I read it, I had a smile when I saw that was enough to tip me off because I hadn't been tipped off. I thought a unit was a can and a unit was the same thing. Well, Judge Cornyn did find that the affiant just made an innocent mistake and she was negligent. But I emphasize again, there was no, you cannot find any evidence to support that. There was no affidavit from the affiant that he considered. The only evidence was the face of the affiant, the affidavit that she said, I got this from reviewing Medicare records. It was false. And the true facts were readily available. So I'm glad you asked that question, Dr. Fisher. It was the point I wanted to make. I'm not a doctor. No, no, not that point. The point about what's missing from the affidavit. Still not a doctor. Did I say Dr. Fisher? Oh, I apologize. That was my father. I apologize. I'm sorry. He would be honored. Anyhow. The point I wanted to make was, and the point I invited scrutiny about, is everybody says in a conclusory fashion, well, there was plenty of probable cause anyhow. And I'll concede that point, but not as to United Medical Supply. The probable cause for that place rests on the representation that they were falsely billing hundreds and hundreds of cans above and beyond. So that was the point I wanted to make there. The second point on the Medicare letter. There was no false billing? I'm sorry? You think there was no false billing on this record? On the entire, separate and apart from the affidavit? You mean what was received at trial? I assumed your argument, the difference, the reason you emphasized the difference between units and cans was because you believed or were willing to assert that there was no false billing. This is all just the mistake on the part of the person who filed it. Not the mistake, it's just the lie on the part of the person who filed the affidavit. Nothing unusual happened in this case. There were approximately 10,000 claimants and approximately 30,000 claims, as I recall. As we pointed out in the brief, Mr. Long's company correctly billed in units, and we believe it was accurate. The heart and soul of the government's case was that the billings and the supplying of the material was not medically necessary. It was within Medicare range. I'm sorry? If it were, if the affidavit had been stated in units rather than cans, the total amounts would have been within Medicare range on the face of it. It would have been precisely accurate. It is exactly what he billed and precisely in the Medicare range and precisely what was prescribed by the doctor, and that's set out very clearly in the brief with citations to the record, Your Honor. So that gets me to the second point. The heart and soul of the government's case was that whatever was supplied was not medically necessary. And the government called seven witnesses to establish that, and the only other evidence presented, which runs into a Crawford v. Washington problem, was this Medicare letter quoting two doctors as saying these were not medically necessary. They were interviewed by Medicare a year or two before the letter was written, and the letter was written to Mr. Long. They were co-defendants? They were co-defendants. They did not. They were under investigation at the time they made their statements trying to avoid prosecution, and the letter was written to Mr. Long's company about a year after the conspiracy ended. Exhibit 43. 43, saying we've concluded you defrauded us and these doctors told us that, and the government relied on that for the proof of medical necessity. So you obviously, Dr. Fisher, have that squared away. Thank you. And the last point I just wanted to make. I just wanted to invite scrutiny that the response to the jury's question unfairly singled out those two pro-prosecution instructions, and really the way it was framed was unduly coercive, and we cited plenty of cases. So I just think those three things invite scrutiny. Thank you for your time. It doesn't make a lot of difference, but at some point, tell me how many units were in the can. There are 2.5 units in a can. Good morning, Your Honors. May it please the Court, Jeannie Joseph on behalf of the United States. I'll try to focus my comments more on the Kim case per your instruction. I'm happy to answer any questions for the Court. The problem, just to focus on Mr. Kim, the district court was clearly troubled by the thinness of the evidence with respect to his knowledge about this being illegal activity. Counsel has framed it as the government essentially going on a should-have-known, must-have-known type of case. Your position, I understand, is that there's circumstantial evidence. I've gone through that evidence. I have some problems myself. For example, the fact that he had these patients sign blank forms. What does that prove? Well, Your Honor, I think that's a good point, and I'd also like to point out today some additional evidence that I didn't necessarily emphasize in the brief that shows, I think, from which a rational jury could draw a reasonable inference that this defendant, Kim, knowingly and willfully participated in the scheme to defraud Medicare. And I think Mr. Kim's making the beneficiary sign those blank delivery forms is actually very significant, especially if you look at those forms. When you say they're blank, what do you mean they're blank? Well, when the beneficiaries initially went to the doctor's office, they went up to the front desk with the defendant, Kim, or with the drivers, because the driver's name would have to be taken down to get credit to get their kickback for recruiting the patient. Don't overload the narrative here. Okay. Defendant Kim would instruct them to give their Medicare cards over, which they would do, again, showing knowledge that Medicare being billed here. And if you look at these delivery tickets, at most they would have perhaps the patient's name at the top. Most of the times they were blank as to what items were going to be delivered at that time. They were filled out later. But also on those delivery tickets is a... Who were they filled out by? They were filled out by the office staff and also by UMS. But what does that mean as to a driver? Let's suppose Mr. Kim had been a totally legitimate driver, got $20 per head for transporting them, bringing them back. What about that aspect of driving would prove that he had knowledge that he was doing anything more than taking somebody to a doctor's office and he was essentially acting as a middle person between a non-English-speaking patient and an English-speaking patient? So he was essentially a non-English-speaking enterprise with English forms. A couple of things, Your Honors. Defendant Kim would translate the forms for the defendants and also he told them, look, if you don't sign these forms, you don't get your free milk. Yes. On these forms, again, there's a place for the Medicare number showing that Medicare is being billed and statements at the bottom showing that the patient's signing, they authorize the medical benefits of Medicare to be paid to UMS and authorize their release of information. So what? Well, again, it shows that they're signing these forms, they're made to sign these forms when they first get there, before they've seen a doctor, before they're prescribed anything. So what? I think the point is he's making them sign forms that they've received something when they haven't received anything at all. He's driving them down there with the form. Did they get, to his knowledge, did they get milk? Well, initially, I think after the first visit down there, when he drops them off, he does give them a couple of cases. Yes. Now, I think what's interesting about the subsequent delivery tickets, which he tries to make these people sign, is, number one, he's repeatedly getting told, I don't want it and I don't need it. Again, an instance can be drawn that he knows the lack of medical necessity. In addition, these forms are filled out. These forms list on them internal nutrition. Again, bill to Medicare is actually written on these forms. And these syringe kits, the way to, you're supposed to administer them through a feeding tube, and the same sort of authorization language I talked about before. But now he's trying to deliver items. He's not even trying to deliver syringe kits. He is trying to make beneficiaries sign forms for things he knows that they are not receiving. And he's still trying to get them to sign them. I think a rational jury can make an inference, reasonable inference from that, that he knows that this is part of a scheme to defraud Medicare. You would agree, would you not, that this evidence is a little on the thin side as to Mr. Kim. I'm looking here on page 63. I guess it's a record 0145. This is a testimony of the other Mr. Kim, one of the witnesses. He says, the question was, did you have to sign any forms while you were at the doctor's office? Answer, we didn't fill out. However, Paul Kim and the lady he brought, a young Korean woman, they fill out those forms.  Answer, yes, saying that if we did not sign, we would not get any milk on the way out after the visit. Were these forms in English? Answer, yes, all in English. So since we did not know about these forms, we listened to the young lady who followed us around and told me to sign. That was one Korean beneficiary, Your Honor, but there were numerous others. Ah Kim testified that Kim, in particular, told her to sign the forms at the doctor's office. She also identified one of the delivery forms as the document he made her sign. We also had Jong Soon Nam, another Korean beneficiary, who said that when she arrived at the doctor's office, it was Kim that asked for her Medicare card. Kim handed her the forms to fill out, and Kim told her to sign those forms again. But again, counsel, following up on what Judge Fischer said, admittedly, on a circumstantial basis, it sounds, how could you not know, et cetera, et cetera. But the fact is, just because someone asks someone to sign a form does not in and of itself constitute a criminal act, does it? I think you're right, Your Honor. I think what we do is we have to look at all of the circumstantial evidence presented. And again, the standard is whether any rational jury could have made that reasonable inference. We don't have to exclude all other. They have to make not only that inference, but they have to make all kinds of inferences with all kinds of evidence, don't they, in order to convict this man? I think it's one inference that can be made from the circumstantial evidence presented. And we don't just have that. We focused on some of those things, but there was a lot of other circumstantial evidence presented. And I think what we have to do is to look at how different this scheme operates than when a normal person has a medical problem and goes and seeks out maybe their regular doctor and gets treatment and may be prescribed. How do we know that Mr. Kim, an immigrant to this country, knows what normally happens? Well, Your Honor, he may be an immigrant. You make these statements, you know, and that's, you know, I'm thinking of myself. I have a 92-year-old mother-in-law who gets transported from her assisted living facility by a driver in the facility who takes her to the doctor and she can't see, so I have no idea what that driver has to sign or explain to her or anything else. And he's certainly not involved in any Medicare fraud. And if our doctor is, then we'll be shocked, but I wouldn't hold him liable for it on that kind of evidence. So that's what I'm trying to get a feel for here. Well, first of all, I think that jurors can bring sort of their common sense, and we all do, to their deliberations. But I think, again, there are lots of things about this, the way this office and this scheme operated that creates this inference. How about being specific with respect to Mr. Kim? Let me be specific. Again, he is driving many, many people from Los Angeles all the way to Orange County, not to their regular doctor, but some one doctor in particular in Orange County. Does he know that these people have regular doctors? Well, if he doesn't, what we do know is that he knows that these patients never see this doctor more than one time, because he's the driver. And we know from the claims data. Wait a minute. There are several drivers, we're told. That's correct. Okay. So where's the evidence that he was the only driver for this group, for these people? Well, we did see, we heard about how this scheme worked and that patients that were recruited by doctors, and that was noted, that was documented, what patients belonged to which drivers. We saw documentary evidence at trial. Mr. Kim knew that? Yes. We saw Exhibit 78 and 78A at trial. And we saw, we heard evidence that when the patients... Those showed what? What did Exhibit 78 and 78A show? It was copies of Medicare card pages where the drivers who were responsible for recruiting the patients was categorically as a practice written down on those pages. By whom? By the office employees. And Mr. Kim was aware of that form? Yes, because when, again, when they all came to the office, the testimony by the employees of the doctor's office was that the driver was there, it was noted who the driver was, they copied the Medicare card, noted that. So, again, the driver could get credited and get paid. All right. Now, let's suppose that this patient got transported in a week when Mr. Kim wasn't available. Well, again, we know from the Medicare claims data that the patients that were recruited by Mr. Kim were seen one time by the doctor only. So that we know from the Medicare claims data. But Mr. Kim knows that he's only doing a one-time per patient trip down to Santa Ana. That's correct, Your Honor. And we know that it was more than just the four patients that we call those witnesses in the indictment, because we have approximately 200 of those Medicare card pages of patients recruited by Peter Kim. And that, again, was exhibit 78 and 78A. So he drives these van loads of people, and we know that there's lots of these people. How many are in a van? We know at least four from the Korean witnesses. That's interesting. The van that takes my mother-in-law to the doctor seats six people. And sometimes they caravan with two vans. Sometimes they have six people in it, because they take them to multiple doctors or to the same facility. Correct. And, again, sometimes... And I want to understand what a jury is supposed to infer about criminal knowledge, which is the government's burden to establish. Suspicious circumstances, understand. Circumstantial evidence, understand. But you have the burden, the government has the burden, to prove specific intent in this crime. I think what's significant about the van loads of people, and, again, sometimes they caravan and there would be two van loads of people if they had too many, was that they would show up in these large groups without any appointments. So what? People go to clinics without appointments. That's the only way they get to the place. Mr. Joseph, maybe if you would help me, because maybe the question before us differs from what I'm assuming it is. What is the question before this Court at this time on this record? On this appeal, I think it's whether the government presented sufficient evidence from which a rational jury could form as a reasonable inference that defendant Kim had the requisite knowledge and intent to participate in this scheme to defraud Medicare. The only question before us, whether a reasonable jury could have concluded guilt based on the circumstances. I think that's probably a shorter way of saying it. I thought that's what we were talking about, but in any event, why don't you go ahead and say you had other persuasive evidence. A few more things. We know that Mr. Kim, defendant Kim, knew that these patients were seen very quickly, five or ten minutes, by the doctor. We know that he knew that it was a foregone conclusion that they were going to get this milk. We know that that was the deal. The only reason they were going was to get free milk. He basically told them that to make them sign the paperwork. We know it was already in his van when he drove down there. Again, a foregone conclusion, they're going to get this milk. This is a kickback. But, again, these are crimes of specific intent, and the government has the burden to show beyond a reasonable doubt that he knowingly and willfully engaged to defraud this government health insurance prime. What Judge Fischer has been talking about is the fact that somebody can perfectly innocently do much of what you've described and what the record indicates without having either of those specific intents. What can you cite to in the record, other than the circumstantial evidence that you've indicated thus far that shows that Mr. Kim, had fraudulent intent, specific intent to defraud the government? Okay. I did want to address this initial matter, and I will answer that, simply that, again, we don't have to exclude every innocent explanation. We simply have to present circumstantial evidence from which someone, that could be one of the inferences. And show beyond a reasonable doubt. Yes. And I think one of the strongest ones, again, is Defendant Kim making, trying to get beneficiaries to sign for deliveries of things that never were delivered at all. I think that's good. What weight do you put on the monetary compensation? That was my next point, because Your Honors brought this up, and I actually do put weight on that. Because, actually, I believe $31,000 in a five-month period from June 7th, 2003 to November 5th, 2003 is the dates, is a significant amount of money for what he was doing. That's $6,000 a month. In addition to the $20 per head he's collecting from these patients purportedly for transportation. The mention made of $13,000 of it was a car loan, basically. Well, I don't think there's any evidence that the $13,000 should be deducted from the $31,000 or added on to it as an additional amount. I don't think that that was established either way. But I think, frankly, the offering of a car loan to a driver, too, is sort of an unusual inducement in this case. And I think that that actually is a lot of money. Even if he paid it back? I'm sorry? If he paid it back. Did he pay it back? There's no evidence whether or not he paid it back. I think that's a lot of money, considering the type of work he's doing, which is driving people to a doctor's office, when he's already getting purportedly paid for that transportation by the patients directly. And who is he, as Your Honor's noted, who is he getting paid by? He's getting paid by UMS. Two more questions, because you're running the time down. We're running it collectively. I'm not blaming you. I'm just noting it. One is about this clandestine meeting at this sort of deep throat kind of meeting, it looks like, in a parking garage. And then shifting over to Mr. Long's case, how do you respond on the Franks issue, that if you delete the substantial overstatement about the amount of units, that it eliminates the probable cause as to UMS? Okay. Lastly, I do want to address the clandestine meeting, because, yes, it was in an underground parking lot, but what I think is really more interesting, and perhaps significant, is that here's someone who's getting switched around and getting this internal nutrition in a parking lot from somebody else. This other person was a co-schemer who drove up from Orange County, who got the supply from UltraCare, and is giving it to them in Los Angeles, when in reality, these people are supposed to be coming to the doctor to get the supply. And I think that there's a lot of evidence at why he's getting the internal nutrition in a parking lot somewhere in Los Angeles. So let me turn to Luong. And, Your Honors, I think that there actually is, there's a great deal in that search warrant affidavit, even if you excise the incorrect statement about the cans versus units, that there was a lot of probable cause remaining. Just focus on UMS. Absolutely. What the affidavit established, actually, there was two things. Number one, there was a lack of medical necessity for the internal nutrition, primarily. And secondly, there was the second problem about how much was being delivered. And the difference between the cans and units was only one very small part, actually, of that. There was 363 complaints by beneficiaries to Medicare that they did not need or want the internal nutrition, and or they did not receive the internal nutrition. There was a Medicare fraud investigator who analyzed the claims data and noticed that 2 million of the 3 million being billed by UMS all came from the one referring doctor, Dr. Hubbard. That's a lot. They also heard about cappers being used to bring the patients to the doctor, and then subsequently UMS was billing for the internal nutrition. And they put UMS on prepayment review, requesting them to submit documentation supporting the medical necessity for the internal nutrition and the DME, as well as to prove that it was delivered. And they were unable to do that, you know, every claim after they were put on prepayment review. We also, there was analysis of the Medicare claims data. Again, where 93 of 100 patients seen by Dr. Katibloo were billed by UMS for internal nutrition. And all of those people only had a single office visit with the doctor. There were statements by a Medi-Cal investigator about, again, complaints by beneficiaries that they didn't want or need the internal nutrition, and also indications that they were being recruited by offers of free milk, being taken to Dr. Hubbard's office, and then being given free milk and being billed, UMS being, billing Medicare for that. We had landlord-tenant complaints. I guess that's more about the doctor's office. But we also had the beneficiary interviews in the indictment. I'm sorry. The beneficiaries that were interviewed, and their statements were in the affidavit, that they were recruited to, with the free milk, to go see these two particular doctors. They didn't have any medical need for it, and they weren't given what was billed. I'm sorry. You're over time. If that's all, Your Honor, thank you very much. Thank you. I just wanted to bring up that I don't think there was any evidence whatsoever or any proof whatsoever that Mr. Kim ever attempted to get anybody to sign for milk that they had not received. I think when he went there, he might have wanted to give them milk, as he was commissioned to do, but if they refused it, he might have been upset about it, but didn't make them sign for something. He simply left. If there were any billings that were submitted based on milk not received, it certainly wasn't because he didn't deliver it. These were other receipts that may have been issued by somebody else or might have been maybe forged by somebody else, but certainly I don't think there's any evidence to show that there was anything paid for anything he didn't deliver. There were 80,000, I think, prescriptions for this. And again, the court has questioned the prosecutor on this. I won't go into it any further, but I think the key thing here is should have known is not good enough. Thank you so much. All right. Thank you, counsel. The case argued is submitted. All right. One quick. The point raised about medical necessity and probable cause, I would address that briefly by saying that a supply company would have no more knowledge of medical necessity than the local pharmacy. They just fill prescriptions. And the evidence at trial was that when Medicare sent in a request for proof of medical necessity, UMS sent requests to the doctors for the information. But the doctors didn't respond. The second point raised by Judge Ferris, I would refer you to two pages to answer your questions about the difference between cans and units, Your Honor. Page 6 of Appellant's opening brief and page 131 of the excerpt of record, which way? I needed to know how many units were in a can, and you didn't tell me, but she did. And unless you're going to tell me she's wrong, she said two and a half units make up a can. Is she right or wrong? A unit is equivalent to 100 calories, and a normal amount for 30 days would be 400. How many units are in a can? I forgot the exact number. I know it's in here. I'm sorry. It's about 100 something. That's what I asked you, and you didn't tell me, and she said two and a half. Now, if you want to tell me she's wrong, we are ready to hear you. Otherwise... I may have been confusing units with calories. I apologize. And it doesn't matter to us, because she wasn't talking about calories. She talked about cans, and she should have been talking about units. Isn't that the allegation? Thank you for the extra time, Your Honor. Thank you.
judges: Farris, Fisher, Smith